UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

_____

UNITED STATES OF AMERICA          )
                                  )
                                  )
vs.                               )   CASE NO. 1:09-00009
                                  )
                                  )
JULIE A. CRUZ                     )

_____


TRANSCRIPT OF PROCEEDINGS
SENTENCING HEARING

_____

BEFORE:                THE HONORABLE ALETA A. TRAUGER

DATE:                  APRIL 11, 2011

TIME:                  1:00 P.M.

_____

APPEARANCES:

FOR THE GOVERNMENT:    BRENT HANNAFAN
                       U.S. Attorney's Office
                       Nashville, Tennessee

FOR THE DEFENDANT:     DAVID COOPER
                       Nashville, Tennessee

_____


REPORTED BY:           BEVERLY E. "BECKY" COLE, RPR
                       OFFICIAL COURT REPORTER
                       A-837 U.S. COURTHOUSE
                       NASHVILLE, TN  37203
                       (615) 726-4893
                       BECKY_COLE@TNMD.USCOURTS.GOV

1          THE COURT:  Good afternoon.  We're here on

2     sentencing in United States vs. Julie Cruz.  We have Brent

3     Hannafan for the government and David Cooper for Ms. Cruz.

4     Ms. Cruz is in the courtroom.  Good afternoon.  Ms. Cruz,

5     have you read the presentence report?

6               MS. CRUZ:  Yes, ma'am.

7               THE COURT:  Do you feel you understand it?

8               MS. CRUZ:  Yes, I do.

9               THE COURT:  Mr. Cooper, do you have some

10    witnesses for today?

11              MR. COOPER:  Your Honor, I have one witness.  I'm

12    told Vonda Mercer is here on this issue of harsh

13    incarceration, so that's the one witness I would have on

14    that particular issue.

15              THE COURT:  Okay.  You want to go ahead and call

16    that person?

17              MR. COOPER:  I can do that, yes, ma'am.

18              THE COURT:  Where is she?

19              THE MARSHAL:  She's back in the back, Judge.

20    I'll have to get somebody in here real quick.  They are

21    bringing her up right now.

22              THE COURT:  Okay.  Let me go through some of the

23    procedure here then.

24         First of all, I find that allowing Ms. Cruz under this

25    plea agreement to plead to Count One and have the government

1    dismiss the remaining counts against her adequately

2    addresses the actual offense behavior and accepting this

3    plea agreement will not offend the purposes of sentencing.

4    So I'm going to go ahead and accept the plea and plea

5    agreement at this time.

6         And other than the 3553(a) factors, I guess there are

7    no issues in dispute.  Is that right, Mr. Cooper?

8              MR. COOPER:  That's correct, Your Honor.

9              THE COURT:  Okay.  So I'm going to accept the

10   presentence report as revised with an amendment this morning

11   as my findings of fact on all issues and on the application

12   of the guidelines.

13        The offense level is a 35.  The criminal history

14   category is I.  The resulting guideline range is 168 months

15   to 210 months with five years of supervised release.  There

16   is in place a minimum mandatory of 120 months.

17        It was envisioned in the plea agreement that Ms. Cruz

18   would receive the safety valve but she did not because she

19   did not wish to cooperate in the way that she contemplated

20   cooperating.

21        Let me ask just as a factual matter, Mr. Cooper, what

22   is your position in terms of -- you assert that she

23   cooperated early on, and I certainly can take into account

24   cooperation that did not result in a 5K motion for the

25   safety valve recommendation by the government.  What is your

1    position in terms of what that cooperation consisted of?

2              MR. COOPER:  Well, Your Honor, I actually had

3    made a copy of the proffer that was done back on July 10,

4    2009.  This was just a few days after Ms. Cruz was arrested

5    where she gave not really only information about herself but

6    also about other individuals including -- I don't know if I

7    need to get into all that or not.

8              THE COURT:  No.

9              MR. COOPER:  Like I said, I have a copy of it if

10   the Court would like that.  Mr. Hannafan provided me that.

11             MR. HANNAFAN:  I don't think that's necessary.  I

12   actually provided that to Mr. Cooper on the condition he

13   would not share it with anyone else.

14             MR. COOPER:  Which I have not done, by the way.

15             MR. HANNAFAN:  I'm not accusing you of that.  It

16   was provided to him so that he could discuss the issues --

17   he wanted to see the report that we had done regarding the

18   interview we had with Ms. Cruz and as it related to some

19   other individuals.

20        And I gave it to him under the condition that he not

21   share it with anyone else.  I don't see how it's relevant.

22   I certainly don't think the Court should receive a copy of

23   it or it should be made an exhibit.

24             THE COURT:  Okay.  This was before you were

25   involved in the case, Mr. Cooper?

1          MR. COOPER:  No, Your Honor, I was involved in

2     the case.

3          THE COURT:  You were involved?

4          MR. COOPER:  Yes, ma'am, I was sitting right

5     there with her.  I thought the Court's question was how has

6     she or what has she done before now as far as cooperation,

7     and I just wanted to explain that to the Court.  Obviously,

8     the report goes into a lot of detail about that.

9          THE COURT:  So she was extensively interviewed by

10    whom, DEA, Mr. Hannafan?

11         MR. COOPER:  Agents of the government.

12         MR. HANNAFAN:  We had one meeting, Your Honor.

13         THE COURT:  Okay.

14         MR. HANNAFAN:  And to make a long story short,

15    there was discussion of whether or not Ms. Cruz would

16    cooperate against her brother, Tick Payne.  We did not get

17    into the details of Mr. Payne's involvement during that

18    proffer.

19         The defendant was still trying to make up her mind

20    whether she wanted to do that.  As I said in my papers, I

21    was later advised by Mr. Cooper that she did wish to

22    cooperate against her brother.  I disclosed that cooperation

23    to Mr. Payne's attorneys, Mr. Terry and Ms. Gore, but Ms.

24    Cruz has since decided she goes not wish to cooperate any

25    further, she would not testify against her brother, and she

1    did not want to come in and complete the proffer and tell us

2    everything she knew about him, which was she required to do

3    under the safety valve.

4            That's my understanding as to where we stand right

5    now.

6                MR. COOPER:  I agree with all that, Your Honor.

7                THE COURT:  That's fine.

8                MR. COOPER:  That's accurate.

9                THE COURT:  I don't need to see the proffer.

10                MR. COOPER:  I just wanted to make sure the Court

11    understood that.

12                THE COURT:  That's fine.  Thank you very much.

13    Okay.  Looks like your witness is here.  Would you like to

14    call your witness?

15                MR. COOPER:  Yes.  Ms. Mercer?

16                THE CLERK:  Raise your right hand.

17                (WITNESS WAS SWORN.)

18                THE CLERK:  Take the witness stand.

19                        VONDA MERCER,

20              having first been duly sworn,

21            was examined and testified as follows:

22                    DIRECT EXAMINATION

23    BY MR. COOPER:

24    Q    Ma'am, you are Vonda Mercer.  Is that correct?

25    A    Yes, sir.

1    Q    Your last name is spelled M-E-R-C-E-R.  Is that
2    correct?
3                THE COURT:  How do you spell your first name?
4                THE WITNESS:  V-O-N-D-A.
5    BY MR. COOPER:
6    Q    Try to make sure you talk into the microphone so we
7    can understand you, okay?
8    A    Okay.
9    Q    Ms. Mercer, I'm David Cooper.  I represent Julie Cruz.
10   You and I have never met or talked before now.  Is that
11   correct?
12   A    No, sir.
13   Q    All right.  Now, it's my understanding that you were
14   and may still -- are still an inmate at the Maury County
15   Jail.  Is that correct?
16   A    Yes, sir.
17   Q    All right.  And when were you first incarcerated at
18   the Maury County Jail?
19   A    August 25, 2010.
20   Q    Of what year?  Pardon?
21   A    2010.
22   Q    And you are still incarcerated there.  Is that
23   correct?
24   A    Yes, sir.
25   Q    And do you know why you have been brought in here to

1    court today, Ms. Mercer?  Do you have some idea about why I

2    subpoenaed you here?

3    A      Yes, sir.

4    Q      Why is that?

5    A      To tell about the quality of the jail.

6    Q      All right.  And some of the conditions there at the

7    Maury County Jail.  Is that correct?

8    A      Yes, sir.

9    Q      All right.  I want to go through a few things.  And

10   first off, there have been some letters written by some of

11   the other ladies there at the jail.  Were you aware that

12   they had written some letters about the conditions there at

13   the jail?

14   A      Yes, sir.

15   Q      Now, it's my understanding that you have not written a

16   letter; at least, I have not gotten one from you.  Is that

17   correct?

18   A      Right.

19   Q      I want to go through a few things and ask you, first

20   off, in terms of your cell conditions and how you are

21   housed, could you sort of explain that to Judge Trauger in

22   terms of how you're kept each day, Ms. Mercer?  Could you do

23   that for us?

24   A      Yes.  It's a two-man cell.  And there's usually four

25   people in it, so there's two on the floor.  And the sink and

1    toilet is together, and there's black mold in the sink and

2    the toilet, and there's cracks in the edge of the wall.

3           And there was a snake in our room the other day or —

4    they didn't catch it, so whatever it was, it was about that

5    long, and it was black.  And I seen it under Julie's bed.

6    Q    When you are saying it's "about that long", looks like

7    about six inches long?

8              THE WITNESS:  Whatever that is, and it was black.

9              THE COURT:  I'd say that's about a foot.

10             THE WITNESS:  And it was about that wide, about

11   as wide as my — and it was crawling down the wall.

12   BY MR. COOPER:

13   Q    Hold on.  Ms. Mercer, slow down.  Let me ask you.

14   About as wide at your little finger?

15   A    Right, and it was crawling down the wall trying to go

16   up the bedpost where her bed is.

17          And when the CO's got down there, they didn't catch

18   it, so I'm assuming it went down in that crack again,

19   wherever it came from.  So we clogged it up with a pad, the

20   crack.

21   Q    A pad?

22   A    A pad.  The crack in the wall, we clogged it up so it

23   wouldn't come back.

24          We're locked in there, we get out a hour and 15

25   minutes a day, so we're locked in that room 23 hours and 45

1  minutes.

2  Q    Let me stop you there.  You said it's a cell made for

3  two people, but there's actually four females in there.  Is

4  that correct?

5  A    Right.  Me and Julie had a bunk, and there was two on

6  the floor.

7  Q    So you and Ms. Cruz have a cell together.  Is that

8  correct?

9  A    Uh-huh.

10 Q    And how long has it been where four ladies have been

11 in a two-person cell, how long has that been going on?

12 A    Well, not the same -- the whole time I have been

13 there, but it's been different ones.  We might have been in

14 there by ourself, just me and Julie, for a month, and

15 then -- but we have had -- we have had four in there for a

16 pretty good while now.

17 Q    Okay.  And these other two females are just having to

18 sleep on the floor.  Is that correct?

19 A    On a mat, uh-huh.  Just a mat.

20 Q    They have a mat, I take it?

21 A    Uh-huh.

22 Q    Is that a yes?

23 A    Yes.

24 Q    All right.  And you say you get out of this cell about

25 an hour and 15 minutes each day.  Is that correct?

1  A      To take a shower and use the phone.

2  Q      Okay.

3  A      That's everybody in the pod, or —— so there's probably

4  about 35 women in there, and they do one side at a time.  So

5  we get out an hour and 15 minutes, one side, probably about

6  20 people, 15 people, to take a shower and use the phone.

7  Q      How many pods are there?

8  A      Thirteen.

9  Q      And about how many cells are there for the female

10  inmates, approximately?

11  A      There's just 13.  In our pod there's 13 cells.  One of

12  them is a trustee cell.  And then they got the

13  misdemeanor —— it's a open pod —— on the other side.

14  Q      Does —— each cell, is it made for two women?

15  A      Uh-huh.

16  Q      But there's four in each cell.  Is that correct?

17  A      Most —— a lot of the time.  Not all the time, but a

18  lot of the time.

19  Q      All right.  Now, you said that you had what sounds

20  like a snake come into your cell?

21  A      And I know it's too early for snakes, so I don't

22  really know what it was, but I seen it myself, and it moved

23  like a snake.

24  Q      What about any other kind of bugs or roaches or things

25  like that; do you have a problem with that?

A     They was passing out trays one day, and there was a
roach on one of the trays, they had to take it back.

Q     Food tray?

A     Right.  And me and Julie was in the room by ourselves
at one time, and we got our two trays, and there was a roach
come running from the trays and went up the wall, and she
killed it.

      And around the bottom of the wall, there's some kind
of black stuff; I don't know if it's black mold or what it
is.  And where the heat and air comes out, the grate, or
whatever, it's like rusted over, and so it was running down
the wall.

      We got them to let us wash the walls one day because
they were bad, and so now there's like rust running from
that grate down into the sink, where the sink is.  It's
right over the sink.

Q     Is this in your cell that we're talking about?

A     Uh-huh.  As far as I know, I haven't been in but two
of them, but they were both like that.  I have been in two
different cells.

Q     Now, you have talked quite a bit about black mold,
seeing black mold there at the jail.  Is that correct?

A     Yeah.

Q     Does that ever give you any kind of physical problems?

A     We had a headache a lot.  I assumed that's what it was

1  from because it stinks real bad.  And at certain times, like
2  when you run the hot water, it really stinks real bad.  And
3  I'm assuming that's what give us the headache a lot.
4  Q      Do you ever complain to the guards or to the jail
5  officials about this, Ms. Mercer; and, if so, what goes on
6  in terms of the complaints?
7  A      The sergeant -- we wrote a complaint, and the sergeant
8  come down there, Sergeant Truett (phonetic), and he said he
9  didn't smell that mold right then, but whenever we smelt it
10 to let him know, and he would come back down there.  But
11 when we let him know, he never showed up again.
12 Q      I want to move to another topic and ask you with about
13 the food situation there at the jail in terms of what you
14 have to eat each day.  I assume you get three meals each
15 day.  Is that correct, Ms. Mercer?
16 A      Yes, sir, we get three meals.
17 Q      Is there anything about the portions of food that is a
18 problem there in the jail?
19 A      They are really small.  When I first got there, I was
20 so hungry, it would wake me up at night.  I ain't never been
21 like that in my life and -- for about two weeks.  It was --
22 they are really small.  And you get no commissary.
23 Q      You don't get what?
24 A      No commissary.
25 Q      No commissary?

1    A      Right.

2    Q      Since you went into the jail back in August of last

3    year have you noticed any kind of weight loss -- yourself,

4    weight loss, as a result of being there?

5    A      Well, I can tell by looking at myself some, I have,

6    but I haven't been weighed, so I don't know.  The medicine

7    is not -- you don't go to medical much.

8    Q      Describe what -- let's take a breakfast.  Describe

9    what a typical breakfast is like there at the jail, Ms.

10   Mercer.

11   A      It will be a piece of bologna, a box of milk, a little

12   bit of oatmeal or a little bit of grits, and some toast or

13   maybe instead of two pieces of toast, it would be two little

14   biscuits about that big around.  It's usually just toast.

15   We get biscuits once a week.

16   Q      About as big as quarter?

17   A      About a half dollar.

18   Q      Half dollar?

19   A      Yes, sir.

20   Q      Now, the same -- is that how a typical breakfast is?

21   Is that what a typical breakfast consists of?

22   A      Uh-huh.  It's usually grits, but it don't even

23   cover -- the square they put it in, it don't usually even

24   cover the whole square, the grits, or the oatmeal, or the

25   dry cereal.

1          You get dry cereal once a week.  When you get

2     biscuits, you get dry cereal.  And the other time they swap

3     up the grits and oatmeal, but it doesn't even cover the

4     square.

5     Q     Now, same question as to a typical lunch.  Tell me

6     what a typical lunch consists of, Ms. Mercer.

7     A     It might be a hamburger and a salad, piece of cake, or

8     a bologna sandwich, maybe some mashed potatoes, a piece of

9     cake.

10    Q     All right.  What about supper?  Is there a typical

11    supper or is it different?

12    A     Well, they have —— we made a menu, and it's the same

13    thing all month.  But it's —— like if you get a bologna

14    sandwich one day for lunch, you'll get it like two days

15    later.

16          And supper is kind of like that.  If you have

17    Salisbury steak, then you skip a day and you have Salisbury

18    steak again.  And you may have a Salisbury steak and mashed

19    potatoes and a piece of cake and some cabbage, but they

20    don't fill up the squares.  It's all small.  And the piece

21    of cake might be two bites.

22    Q     Are you hungry a lot there at the jail, Ms. Mercer?

23    A     Yeah, when I first —— I think —— I guess my stomach

24    shrunk, or whatever, because when I first went there, I

25    thought I was starving.

1      I complained to Lieutenant Delbert (phonetic) that I

2  was starving, and she said she didn't think nobody was

3  starving in there, that they had some kind of calorie deal

4  going on.

5      But at first I was really hungry.  But at night every

6  night, we're hungry before we go to sleep.

7  Q    Are you still that way?  Do you still get hungry?

8  A    Uh-huh, we try to save our cake and eat it right

9  before we go to sleep because we're always hungry.  But I'm

10 not as hungry as when I first got there that it wakes me up

11 at night.  I couldn't even sleep when I first got there for

12 about two weeks, but I'm hungry when I go to sleep.

13 Q    Now, you have talked about a number of problems and

14 conditions there at the Maury County Jail.  Have you seen

15 any difference between the way female inmates are treated

16 and the way that the male inmates are treated in some of

17 these conditions, Ms. Mercer?

18 A    Yes.

19 Q    Would you explain it to us?

20 A    They get a lot more like things to do for two for one,

21 and they work a lot more.  And they cut the smoking -- they

22 had -- the misdemeanor women got to work in the kitchen

23 where they had the smoking -- they cut the smoking out for

24 the women but the men still smoke, the trustees, and they go

25 to the landfill and work, and now they took the women out of

1    the kitchen and put the men in there too.

2    Q    What about commissary, do the men get commissary or do

3    you know?

4    A    No, I don't know.  I hardly ever see a man.

5    Q    I got you.  Okay.  Your Honor, just one second,

6    please.

7              (Pause.)

8              MR. COOPER:  Your Honor, I think those are all my

9    questions for Ms. Mercer.

10             THE COURT:  Any cross?

11             MR. HANNAFAN:  No questions, Your Honor.

12             THE COURT:  All right.  Thank you, Ms. Mercer.

13   Any other witness other than the defendant's allocution?

14             MR. COOPER:  No other witnesses, Your Honor.  I

15   have got several letters here.  I previously filed most of

16   these.  I have got copies with a couple of maybe additional

17   letters, so I could tender those.

18             THE COURT:  That's fine.  You can tender them.

19             MR. COOPER:  Okay.

20             THE COURT:  Does Mr. Hannafan have copies of

21   them?

22             MR. COOPER:  He has except for two of them.  They

23   are all pretty much the same type of letters.

24        Your Honor, there was a Lee Ann Gifford, I actually

25   anticipated her being here today to testify but I understand

1    she may be in the hospital, but I do have a letter from her.

2              MR. HANNAFAN:  I've got ——

3              THE COURT:  What are the two that have not

4    previously been filed?

5              MR. COOPER:  Mary Felicia Cook.  I have got a

6    letter from her.

7              THE COURT:  Who else?

8              MR. COOPER:  I believe that may be it.  I'm

9    trying to compare.  I believe that's it, Your Honor.  I'll

10   show those to Mr. Hannafan.

11             MR. HANNAFAN:  Same one?  I have got that.

12             MR. COOPER:  Okay.  All right.  All right.  I

13   have got them marked as Exhibits 1 through 8, Your Honor.

14             THE COURT:  All right.  You had previously

15   furnished better copies of the ones that were filed to the

16   Court.

17             MR. COOPER:  Right.

18             THE COURT:  And I presume you gave those to Mr.

19   Hannafan as well because they were very hard to read.

20          Yeah, the last one from Mary Cook is the only one that

21   I have not read, so I'll read that right now.

22             (Pause.)

23             THE COURT:  Okay.  This is the woman that had the

24   miscarriage?

25             MR. COOPER:  Yes, Your Honor.

1              THE COURT:  Okay.

2              MR. COOPER:  Your Honor, a couple of more things,

3      if I may?

4              THE COURT:  Yes.

5              MR. COOPER:  This is not under the heading of

6      harsh incarceration, but I previously filed a letter from

7      Lynn Stefanick who taught Ms. Cruz's GED classes there.

8              THE COURT:  Yes, I have that.

9              MR. COOPER:  I have a copy of that letter marked

10     as Exhibit Number 9, if I may.

11             THE COURT:  Okay.  That's fine.

12             MR. COOPER:  And one other thing, if I could --

13             THE COURT:  Yes.

14             MR. COOPER:  -- Your Honor, I had also filed in

15     this case under seal a report from Dr. Auble.

16             THE COURT:  Yes.

17             MR. COOPER:  And I didn't know if the Court

18     wanted me to file the original, which I guess would be

19     Number 10.  I'm going to be asking that that report be made

20     as part of the presentence investigation report.

21             THE COURT:  Okay.

22             MR. COOPER:  So it will sort of go along with Ms.

23     Cruz in the system.

24             THE COURT:  Well, it's already been filed under

25     seal, so why don't you just give it to Ms. Beasley and -- or

1    maybe give it to ——

2              MS. PUTMAN:  I have it already.

3              MR. COOPER:  I think I sent her a copy already,

4    Your Honor.

5              THE COURT:  We can just append it to the J and C,

6    if you like.

7              MR. COOPER:  That's fine.

8              THE COURT:  That will be fine.  Give her the

9    extra copy and we'll attach it.

10             MR. COOPER:  Give Ms. Beasley the extra copy,

11   Your Honor?

12             THE COURT:  Yes.

13             MR. COOPER:  Number 10, Your Honor.

14             THE COURT:  Okay.  Those are all the exhibits?

15             MR. COOPER:  Yes, Your Honor, I believe those are

16   all the exhibits.

17             THE COURT:  All right.  Ms. Cruz, you have the

18   opportunity to address the Court and tell me anything you

19   want me to hear before I sentence you.  Your lawyer also can

20   speak on your behalf.  So I'm ready for that if you would

21   like to speak.  Can you go to the podium?

22        If you would also tell me who's here on your behalf

23   today?

24             MS. CRUZ:  Okay.  My mother.

25             MR. COOPER:  Susan Roberts, Your Honor.  Her

1  mother is here.

2          THE COURT:  Ms. Roberts that lives in Florida?

3          MS. CRUZ:  Yes.

4          MR. COOPER:  Yes, ma'am.

5          THE COURT:  Okay.  Who else?

6          MS. CRUZ:  My niece and my nephew, Tick's kids,

7  my brother; and my son Chase Cruz; and my friend Julie

8  Mullis and Lane Clanton (phonetic).

9          THE COURT:  Okay.  Go ahead.  Did you say Mr.

10 Cruz is here?

11         MS. CRUZ:  No, my son Chase Cruz.

12         THE COURT:  Oh, your son, okay.

13         MS. CRUZ:  I made a lot of bad choices that I

14 regret.  I hurt my family and I hurt my kids.  Drugs has

15 changed my life.  It made me somebody I wasn't.  I never

16 thought that I would be standing in court in front of my

17 family under these charges.

18     I'm sorry that I'm here.  I'm sorry that it took jail.

19 I'm sorry that I'm standing in front of you as an inmate.

20 I'm sorry that my family is here watching this.

21     I stand behind a drug task force any day.  I

22 appreciate the job that they do.  They are protecting my

23 kids.  I was wrong.  I'm sorry.  I'm sorry.

24         THE COURT:  Okay.  Thank you.  Mr. Cooper, I'm

25 ready for you if you would like to speak.

1          MR. COOPER:  Your Honor, this has obviously been

2   a very emotional situation for Ms. Cruz on a number of

3   fronts not only with her immediate family and her children

4   and her mother being here, but this issue about her brother

5   who's also involved in the case and all of that, and it's

6   obviously has caused a real emotional pull and torment for

7   Ms. Cruz.

8          One of the reasons -- and I'm not going no into a lot

9   of detail about the report just here in open court.  The

10  Court has had a chance to look at.  But one of the reasons

11  that I wanted Dr. Auble to talk to Ms. Cruz was to try to

12  develop some of this stuff to give the Court a better idea

13  of sort of where she has come from to get her to this point.

14         It obviously doesn't excuse her actions in any sense,

15  but it, I think, does in some maybe not small way, but some

16  way explain how she has gotten to this point with some of

17  the family issues.

18         I mean, for gosh sakes, her father introduced her to

19  stealing and all back when she was a child, so when you have

20  got a parent that is instilling that type of behavior into a

21  child, you know, I would think statistics show more times

22  than not, you are going to have somebody that's going to

23  probably live that type of a lifestyle and perhaps even

24  work.  So I'll leave that at that.  The Court has the

25  report.

1    Without the safety valve, the guideline range has

2    obviously gone up to 168 as a minimum in that guideline

3    range.  I think the government is recommending the 120

4    months at the minimum mandatory, and, of course, I would

5    submit to the Court that under these facts and some of the

6    things that I have tried to give to the Court, that under

7    3553 there are factors here both as to Ms. Cruz and her

8    personal life and, of course, some of the issues at the jail

9    that she's had to experience over the last several months

10   that would allow the Court legally and factually to go down

11   to 120 months, and so I would encourage the Court as

12   strongly as I know how to accept that recommendation again

13   based on the facts that have been presented to the Court and

14   give Ms. Cruz a chance to sort of prove herself.

15       I think she's -- again, I thought the letter from Ms.

16   Stefanick was a very nice letter that she wrote.  Ms.

17   Stefanick and I, we only had a brief conversation, and I

18   sort of explained what I was trying to do, and I get that

19   letter in the mail, and I did not prompt her in any way.

20   That was on her behalf to write that letter on behalf of Ms.

21   Cruz, so I think there's a real chance for Ms. Cruz.  And I

22   think with -- the minimum sentence here would be appropriate

23   in this case.

24       Thank you.

25            THE COURT:  Thank you, Mr. Cooper.  Mr. Hannafan?

1          MR. HANNAFAN:  As Your Honor is aware, I had

2    reached an agreement with Mr. Cooper to recommend the

3    mandatory minimum in this case.  This is an extremely

4    serious offense.

5          Ms. Cruz, her brother, her stepmother were all selling

6    methamphetamine for years.  Ms. Cruz and her brother's

7    father and Ms. Royce get arrested in October of 2007.  They

8    are brought here.  They are charged here.  They're charged

9    here in federal court.  Ms. Cruz and her brother were at

10   some of initial proceedings.  I personally saw them there.

11         And yet instead of saying, you know, we haven't been

12   charged, we're going to get out of this, they kept on

13   selling.  And they kept on selling for years.

14         I don't think Ms. Cruz is as culpable as her brother.

15   I think her brother was involved much earlier.  He was the

16   one who got the family involved, and he too continued

17   selling after her relatives were arrested.

18         But nonetheless, in light of all the circumstances

19   surrounding Ms. Cruz including what's been disclosed in the

20   report by Ms. Auble, the letters from her cellmates and just

21   conversations I have had with Mr. Cooper as well as the fact

22   that Ms. Cruz at least initially met with us, in light of

23   all those facts and circumstances, I am willing to recommend

24   the mandatory minimum of ten years.

25              THE COURT:  What is the status of the

1    forfeitures?  Do we need to include all of that in this J

2    and C or is that -- all has taken place?

3              MR. HANNAFAN:  I believe that -- I believe a

4    preliminary order of forfeiture has already been entered as

5    to the property to which Ms. Cruz owned.  I mean, that was

6    part of the plea agreement.  The recommendation as to the

7    sentence I don't think affects the property.

8         My understanding -- if I remember correctly, Your

9    Honor, I think a preliminary order of forfeiture has already

10   been entered as to that property.

11             THE COURT:  She just had an interest in one of

12   the two properties or did she have an interest in both?

13             MR. HANNAFAN:  One of the house -- the house in

14   which she and her children lived was in her name.  The other

15   house -- the other -- it's really two adjacent pieces of

16   property with Tick Payne, with her brother, Mr. Payne, I

17   think she had -- there had been a deed transferring it to

18   her name briefly, and then she transferred it back in a

19   quitclaim deed, and so she had agreed that if it was found

20   she had any interest, she was forfeiting that interest in it

21   as well, but that was the residence of her brother.

22        And I think based upon his guilty plea, that that

23   second piece of property where he was living is also going

24   to be forfeited.

25             THE COURT:  Okay.

1           MR. HANNAFAN:  So I don't think there's -- I

2     don't believe there's anything to do at this time regarding

3     that property.

4               THE COURT:  Okay.

5               MR. HANNAFAN:  Thank you, Your Honor.

6               THE COURT:  Anything else, Mr. Cooper.

7               MR. COOPER:  No, Your Honor, I don't think so.

8               THE COURT:  All right.  Okay.  The Court has many

9     factors to consider in sentencing the defendant to a

10    sentence sufficient but not greater than necessary to comply

11    with the purposes of sentencing.

12         First the Court must consider the nature and

13    circumstances of the offense.  This was a very serious

14    offense, a multi-year conspiracy to distribute

15    methamphetamine, and this defendant is being held

16    accountable for between 5 and 15 kilograms of

17    methamphetamine -- that's a lot of methamphetamine --

18    injected into the community through this conspiracy.  So the

19    Court sees this as a very serious crime.

20         In the court's view methamphetamine is the worst drug.

21    I suspect you agree with that?

22               MS. CRUZ:  Yes, ma'am, it is.

23               THE COURT:  It is the most addictive.  It grabs

24    hold of you and does not let go.  And so I know Ms. Cruz was

25    using it, and lots of other people were allowed to use it

1    and enabled to use it as a result of this conspiracy, so I

2    see it as a very serious crime.

3           In terms of the history and characteristics of this

4    defendant, she has many mitigating factors in her background

5    that do not excuse her criminal conduct here but explain it

6    to a certain extent.

7           As Mr. Cooper pointed out, apparently Ms. Cruz's

8    father was a criminal.  He was in jail a lot.  He taught his

9    children how to shoplift and commit crimes at an early age.

10   He was very physically abusive to her and her brother and

11   her mother.

12          In order to escape the abuse, her mother left when she

13   was 12, and that has to have been a devastating thing to

14   live with as a young girl to be abandoned by your mother and

15   living in a house with an abusive father.  That has to have

16   been devastating.

17          The —— Ms. Cruz's father and his girlfriend were put

18   in jail a couple of years later.  Ms. Cruz and her brother

19   ran and were caught and put in juvenile detention for a

20   period of time.

21          Their mother came and got them and took them back to

22   Florida, but that didn't work very well for very long, and

23   they came back and lived with various relatives.

24          Ms. Cruz was married at a very early age —— I'm sure

25   to get out of her house —— at 15 to her first husband by

whom she has one child; divorced at 19; married again, married several years to Mr. Cruz and has two children by Mr. Cruz.  She had custody of all three of her children until her arrest.

The report from Pam Auble details all of this as well as -- and the presentence report does as well, a horrible assault in 2005 by an old boyfriend, apparently just smashed in her face and her eye, and she probably has post-traumatic stress syndrome as a result of that assault, and apparently her use of methamphetamine began around that time.

She needs mental health treatment, I believe, and probably needed it a long time ago.  Very difficult situation in this case to have been jointly indicted with her brother and her father and being asked to cooperate against at least her brother, and her father committing suicide in jail, and I'm sure she blames herself for that. That's somewhere in here.

And she's got marijuana usage daily starting at 12 and methamphetamine use for four years, Ecstasy.  I guess the most steady employment she's had was working for Mr. Cruz's masonry business while she was married.

So we really have a pretty tragic background, a tragic situation.  She's sitting here with three children under 16, and she is going to go away to jail for quite some time, so it's a very sad day.

1          Taking into account all of these factors, including

2    harsh conditions of confinement at the Maury County Jail for

3    much of the time she's been confined, which I will be

4    reporting to the United States Attorney and requesting that

5    he conduct an investigation of these harsh conditions, and I

6    am hartened to read that apparently the Metro Jail has a

7    whole lot of extra space right now, so perhaps the marshals

8    can look into increasing their head count at the

9    Metropolitan jail instead of this place for which there's a

10   lot of documentation that there are not good conditions for

11   the women particularly.

12         Also, her early cooperation, her fairly lengthy

13   proffer shortly after she was arrested, the Court can take

14   account of cooperation that does not result in a 5K.1 motion

15   or a — an agreement by the government that she's entitled

16   to the safety valve, taking all of those factors into

17   account, I'm going to accept the joint recommendation of the

18   parties and sentence Ms. Cruz to the minimum mandatory of

19   120 months to be followed by five years of supervised

20   release.

21         She has served almost two years of that with good time

22   that I'm sure she will earn.  I feel that sentence despite

23   the fact that it is a downward variance is fully justified

24   by the facts of this case.  It will reflect the seriousness

25   of the offense, promote respect for the law, be a just

punishment, protect the public from further crimes and
hopefully provide the defendant with needed educational and
vocational training, and given the facts of this case will
not result in unwarranted sentencing disparities.

I do not levy a fine because I find she's financially
unable to pay fine.  The $100 special assessment must be
paid.

The special conditions of her supervised release are
drug testing and substance abuse treatment, to furnish
financial records and tax returns.  She's prohibited from
owning, carrying or possessing firearms, destructive devices
or other dangerous weapons.  She's to cooperate in the
collection of DNA.

I would liking to add a special condition of mental
health treatment if that is still necessary when she gets
out.

Mr. Cooper, I would like to recommend mental health
treatment, drug treatment and vocational training.

MR. COOPER:  Yes, Your Honor.  I was going to ask
for the drug treatment, so you have already gotten ahead of
me on that, I guess.  I had one other request.

THE COURT:  Okay.  What's the other request?

MR. COOPER:  Well, that Ms. Cruz be housed at I
think it's Tallahassee in Florida, if you could make that
recommendation on the J&C.  I understand it's just a

1   recommendation, but if you could recommend that?  I believe
2   they have drug treatment there as well.
3              THE COURT:  Okay.  Is it a -- there's a federal
4   facility in Tallahassee?
5              MR. COOPER:  Yes, Your Honor, it's in
6   Tallahassee, Florida.
7              THE COURT:  Okay.  I'll make that recommendation.
8   That's near her mother, I gather?
9              MR. COOPER:  Yes, ma'am.
10             THE COURT:  That's near your mother, yeah.  Does
11  anyone have objections to my sentence that have not
12  previously been raised?
13             MR. HANNAFAN:  No, Your Honor.
14             MR. COOPER:  No, Your Honor.
15             THE COURT:  Ms. Cruz, to the extent you retained
16  your right to appeal in your plea agreement, any appeal must
17  be filed within 14 days.  You may apply to appeal under the
18  pauper's oath, and the clerk will file your notice of appeal
19  if you request the clerk to do so.
20         I hope you are transported quickly from this place
21  where you are incarcerated.
22         Ms. Cruz, I think that your remorse is very genuine.
23  This obviously is a horrible situation.  I hope your time
24  passes quickly.  You were engaged in a very serious offense,
25  and Congress has determined that for offense of this sort,

1    there is a minimum sentence that I have no discretion to go

2    under without -- except for a couple of exceptions which

3    don't apply here.

4         I think that your attitude and achievement in the GED

5    course is hopefully emblematic of what will lie ahead for

6    you; that you are hopefully going to pour yourself into

7    every program you can get and work very hard to get some

8    more job skills so that when you get out, you can have a way

9    to support yourself and your children.  I hope you can stay

10   in touch with your children, and I wish you good luck.

11              MS. CRUZ:  Thank you.

12              THE COURT:  Anything else?

13              MR. HANNAFAN:  Just --

14              THE COURT:  You need to dismiss these counts?

15              MR. HANNAFAN:  Yes, dismiss the remaining counts

16   and just to advise Your Honor, I have passed on the

17   information that I received regarding Maury County to the

18   Marshals Office.

19              THE COURT:  Okay.  Good.

20              MR. COOPER:  Nothing further from the defendant.

21              THE COURT:  We're in recess.

22

23

24

25

1          REPORTER'S CERTIFICATE

2

3          I, BEVERLY E. "BECKY" COLE, Official Court

4     Reporter for the United States District Court for the Middle

5     District of Tennessee, with offices at Nashville, do hereby

6     certify:

7          That I reported on the stenotype shorthand machine

8     the proceedings held in open court on April 11, 2011 in the

9     matter of UNITED STATES OF AMERICA vs. JULIE A. CRUZ, Case

10    No. 1:09-00009;

11         That an excerpt of proceedings in connection with

12    the hearing was reduced to typewritten form by me;

13         That the foregoing transcript is a true and

14    accurate record of the proceedings to the best of my skills

15    and abilities;

16         This the 11th day of April, 2011.

17

18

19

20                   /s/
                BEVERLY E. COLE, RPR
21

22

23

24

25

1

2

3

4

5

6

7          THE COURT:  All right.  Okay.  The Court has many

8    factors to consider in sentencing the defendant to a

9    sentence sufficient but not greater than necessary to comply

10   with the purposes of sentencing.

11        First the Court must consider the nature and

12   circumstances of the offense.  This was a very serious

13   offense, a multi-year conspiracy to distribute

14   methamphetamine, and this defendant is being held

15   accountable for between 5 and 15 kilograms of

16   methamphetamine -- that's a lot of methamphetamine --

17   injected into the community through this conspiracy.  So the

18   Court sees this as a very serious crime.

19        In the court's view methamphetamine is the worst drug.

20   I suspect you agree with that?

21          MS. CRUZ:  Yes, ma'am, it is.

22          THE COURT:  It is the most addictive.  It grabs

23   hold of you and does not let go.  And so I know Ms. Cruz was

24   using it, and lots of other people were allowed to use it

25   and enabled to use it as a result of this conspiracy, so I

1    see it as a very serious crime.

2        In terms of the history and characteristics of this

3    defendant, she has many mitigating factors in her background

4    that do not excuse her criminal conduct here but explain it

5    to a certain extent.

6        As Mr. Cooper pointed out, apparently Ms. Cruz's

7    father was a criminal.  He was in jail a lot.  He taught his

8    children how to shoplift and commit crimes at an early age.

9    He was very physically abusive to her and her brother and

10   her mother.

11       In order to escape the abuse, her mother left when she

12   was 12, and that has to have been a devastating thing to

13   live with as a young girl to be abandoned by your mother and

14   living in a house with an abusive father.  That has to have

15   been devastating.

16       The —— Ms. Cruz's father and his girlfriend were put

17   in jail a couple of years later.  Ms. Cruz and her brother

18   ran and were caught and put in juvenile detention for a

19   period of time.

20       Their mother came and got them and took them back to

21   Florida, but that didn't work very well for very long, and

22   they came back and lived with various relatives.

23       Ms. Cruz was married at a very early age —— I'm sure

24   to get out of her house —— at 15 to her first husband by

25   whom she has one child; divorced at 19; married again,

married several years to Mr. Cruz and has two children by
Mr. Cruz.  She had custody of all three of her children
until her arrest.

The report from Pam Auble details all of this as well
as -- and the presentence report does as well, a horrible
assault in 2005 by an old boyfriend, apparently just smashed
in her face and her eye, and she probably has post-traumatic
stress syndrome as a result of that assault, and apparently
her use of methamphetamine began around that time.

She needs mental health treatment, I believe, and
probably needed it a long time ago.  Very difficult
situation in this case to have been jointly indicted with
her brother and her father and being asked to cooperate
against at least her brother, and her father committing
suicide in jail, and I'm sure she blames herself for that.
That's somewhere in here.

And she's got marijuana usage daily starting at 12 and
methamphetamine use for four years, Ecstasy.  I guess the
most steady employment she's had was working for Mr. Cruz's
masonry business while she was married.

So we really have a pretty tragic background, a tragic
situation.  She's sitting here with three children under 16,
and she is going to go away to jail for quite some time, so
it's a very sad day.

Taking into account all of these factors, including

harsh conditions of confinement at the Maury County Jail for
much of the time she's been confined, which I will be
reporting to the United States Attorney and requesting that
he conduct an investigation of these harsh conditions, and I
am hartened to read that apparently the Metro Jail has a
whole lot of extra space right now, so perhaps the marshals
can look into increasing their head count at the
Metropolitan jail instead of this place for which there's a
lot of documentation that there are not good conditions for
the women particularly.

       Also, her early cooperation, her fairly lengthy
proffer shortly after she was arrested, the Court can take
account of cooperation that does not result in a 5K.1 motion
or a —— an agreement by the government that she's entitled
to the safety valve, taking all of those factors into
account, I'm going to accept the joint recommendation of the
parties and sentence Ms. Cruz to the minimum mandatory of
120 months to be followed by five years of supervised
release.

       She has served almost two years of that with good time
that I'm sure she will earn.  I feel that sentence despite
the fact that it is a downward variance is fully justified
by the facts of this case.  It will reflect the seriousness
of the offense, promote respect for the law, be a just
punishment, protect the public from further crimes and

1    hopefully provide the defendant with needed educational and

2    vocational training, and given the facts of this case will

3    not result in unwarranted sentencing disparities.

4         I do not levy a fine because I find she's financially

5    unable to pay fine.  The $100 special assessment must be

6    paid.

7         The special conditions of her supervised release are

8    drug testing and substance abuse treatment, to furnish

9    financial records and tax returns.  She's prohibited from

10   owning, carrying or possessing firearms, destructive devices

11   or other dangerous weapons.  She's to cooperate in the

12   collection of DNA.

13        I would liking to add a special condition of mental

14   health treatment if that is still necessary when she gets

15   out.

16        Mr. Cooper, I would like to recommend mental health

17   treatment, drug treatment and vocational training.

18             MR. COOPER:  Yes, Your Honor.  I was going to ask

19   for the drug treatment, so you have already gotten ahead of

20   me on that, I guess.  I had one other request.

21             THE COURT:  Okay.  What's the other request?

22             MR. COOPER:  Well, that Ms. Cruz be housed at I

23   think it's Tallahassee in Florida, if you could make that

24   recommendation on the J&C.  I understand it's just a

25   recommendation, but if you could recommend that?  I believe

1    they have drug treatment there as well.

2             THE COURT:  Okay.  Is it a -- there's a federal

3    facility in Tallahassee?

4             MR. COOPER:  Yes, Your Honor, it's in

5    Tallahassee, Florida.

6             THE COURT:  Okay.  I'll make that recommendation.

7    That's near her mother, I gather?

8             MR. COOPER:  Yes, ma'am.

9             THE COURT:  That's near your mother, yeah.  Does

10   anyone have objections to my sentence that have not

11   previously been raised?

12            MR. HANNAFAN:  No, Your Honor.

13            MR. COOPER:  No, Your Honor.

14            THE COURT:  Ms. Cruz, to the extent you retained

15   your right to appeal in your plea agreement, any appeal must

16   be filed within 14 days.  You may apply to appeal under the

17   pauper's oath, and the clerk will file your notice of appeal

18   if you request the clerk to do so.

19       I hope you are transported quickly from this place

20   where you are incarcerated.

21       Ms. Cruz, I think that your remorse is very genuine.

22   This obviously is a horrible situation.  I hope your time

23   passes quickly.  You were engaged in a very serious offense,

24   and Congress has determined that for offense of this sort,

25   there is a minimum sentence that I have no discretion to go

```
 1   under without -- except for a couple of exceptions which
 2   don't apply here.
 3        I think that your attitude and achievement in the GED
 4   course is hopefully emblematic of what will lie ahead for
 5   you; that you are hopefully going to pour yourself into
 6   every program you can get and work very hard to get some
 7   more job skills so that when you get out, you can have a way
 8   to support yourself and your children.  I hope you can stay
 9   in touch with your children, and I wish you good luck.
10               MS. CRUZ:  Thank you.
11               THE COURT:  Anything else?
12               MR. HANNAFAN:  Just --
13               THE COURT:  You need to dismiss these counts?
14               MR. HANNAFAN:  Yes, dismiss the remaining counts
15   and just to advise Your Honor, I have passed on the
16   information that I received regarding Maury County to the
17   Marshals Office.
18               THE COURT:  Okay.  Good.
19               MR. COOPER:  Nothing further from the defendant.
20               THE COURT:  We're in recess.
21
22
23
24
25
```

REPORTER'S CERTIFICATE

I, BEVERLY E. "BECKY" COLE, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on April 11, 2011 in the matter of UNITED STATES OF AMERICA vs. JULIE A. CRUZ, Case No. 1:09-00009;

That a transcript of proceedings in connection with the hearing was reduced to typewritten form by me;

That the foregoing transcript is a true and accurate record of the proceedings to the best of my skills and abilities;

This the 13th day of April, 2011.


/s/
BEVERLY E. COLE, RPR